1  **HANNI M. FAKHOURY**
   California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Mr. Anastacio-Gomez

6

7

8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE MARILYN L. HUFF)**

11  UNITED STATES OF AMERICA,              )    CASE NO.: 08CR1543-H
                                           )
12              Plaintiff,                 )    Date: June 2, 2008
                                           )    Time: 2:00 p.m.
13  v.                                     )
                                           )    NOTICE OF MOTIONS AND MOTIONS TO:
14  HIJINIO ANASTACIO-GOMEZ,               )
                                           )    (1)    COMPEL DISCOVERY;
15              Defendant.                 )    (2)    PRESERVE EVIDENCE;
                                           )    (3)    DISMISS FOR GRAND JURY ERROR;
16                                         )           AND
                                           )    (4)    GRANT LEAVE TO FILE FURTHER
17  _____       )           MOTIONS

18  TO:    KAREN P. HEWITT, UNITED STATES ATTORNEY, AND
          CARLOS ARGUELLO, ASSISTANT UNITED STATES ATTORNEY:
19

20         PLEASE TAKE NOTICE that on May 27, 2008, at 2:00 p.m., or as soon thereafter as counsel may

21  be heard, defendant, Mario Enrique Anastacio-Gomez, by and through his attorneys, Hanni M. Fakhoury

22  and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following

23  motions.

24  ///

25  ///

26  ///

27  ///

28  ///

1

**MOTIONS**

2      Defendant, Hijinio Anastacio-Gomez, by and through his attorneys, Hanni M. Fakhoury and Federal

3  Defenders of San Diego, Inc., asks this Court pursuant to the United States Constitution, the Federal Rules

4  of Criminal Procedure, and all other applicable statutes, case law, and local rules for an order to:

5      (1)    Compel Discovery;

6      (2)    Preserve Evidence;

7      (3)    Dismiss For Grand Jury Error; and

8      (4)    Grant Leave to File Further Motions.

9      These motions are based upon the instant motions and notice of motions, the attached statement of

10  facts and memorandum of points and authorities, the files and records in the above-captioned matter, and

11  any and all other materials that may come to this Court's attention prior to or during the hearing of these

12  motions.

13                                        Respectfully submitted,

14

15  Dated: May 23, 2008                    *s/ Hanni M. Fakhoury*
                                           **HANNI M. FAKHOURY**
16                                         Federal Defenders of San Diego, Inc.
                                           Attorneys for Mr. Anastacio-Gomez
17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

_____Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her

information and belief, and that a copy of the foregoing document has been served this day upon:

U S Attorneys Office
880 Front Street
Room 6293
San Diego, CA 92101
(619)557-5220
Fax: (619)235-2757

                                      Respectfully submitted,

Dated:  May 23, 2008                        /s/ _Hanni M. Fakhoury_____
                                      **HANNI M. FAKHOURY**
                                      Federal Defenders of San Diego, Inc.
                                      Attorneys for Mr. Anastacio-Gomez
                                      Hanni_Fakhoury@fd.org

1  **HANNI M. FAKHOURY**
California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California  92101-5008
Telephone:  (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Mr. Anastacio-Gomez

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                **(HONORABLE MARILYN L. HUFF)**

11  UNITED STATES OF AMERICA,              )      CASE NO.: 08CR1543-H
                                           )
12                    Plaintiff,           )
                                           )      STATEMENT OF FACTS AND
13  v.                                     )      MEMORANDUM OF POINTS AND
                                           )      AUTHORITIES IN SUPPORT OF MOTIONS
14  **HIJINIO ANASTACIO-GOMEZ**,           )
                                           )
15                    Defendant.           )
                                           )

16

17                             **I.**

18                    **STATEMENT OF FACTS**

19       On May 14, 2008, a one count indictment was handed down by the January 2007 grand jury charging

20  Mr. Anastacio-Gomez with attempted entry after deportation, in violation of 8 U.S.C. § 1326.

21                             **II.**

22       **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

23       Mr. Anastacio-Gomez moves for production of the following discovery.  This request is not limited

24  to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

25  custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See

26  United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). Specifically, Mr. Anastacio-Gomez moves for the

27  production of the following evidence:

28  //

1    1. **Mr. Anastacio-Gomez's Statements.** Mr. Anastacio-Gomez requests the government disclose

2  any and all written, recorded and oral statements made by him, as well any written summaries of his oral

3  statements contained in the handwritten notes of any Government agent. Fed. R. Crim. P. 16(a)(1)(A). The

4  Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must

5  reveal <u>all</u> of Mr. Anastacio-Gomez's statements, whether written or oral, regardless of whether the

6  Government intends to make any use of those statements. **Mr. Anastacio-Gomez specifically requests all**

7  **audio and videotaped copies of his statements and any rough notes taken pertaining to the substance**

8  **of his statements. Mr. Anastacio-Gomez requests that the government provide him with a court-**

9  **certified transcript of the compact disc depicting Mr. Anastacio-Gomez's post-arrest interrogation**

10  **by the agents. Furthermore, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(i), Mr. Anastacio-Gomez**

11  **requests copies of the audio tapes of any taped telephone call made while he was or is in custody.**

12    2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Anastacio-Gomez requests the Government

13  to turn over all arrest reports, notes, dispatch or any other tapes and TECS records that relate to the

14  circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any

15  rough notes, records, reports, transcripts or other documents in which statements of Mr. Anastacio-Gomez

16  or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P.

17  16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must produce arrest reports,

18  investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution

19  reports pertaining to Mr. Anastacio-Gomez. <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 26.2.

20  **Specifically, Mr. Anastacio-Gomez requests copies of any Report of Investigation ("ROI") or Record**

21  **of Deportable/Inadmissible Alien ("I-213") written in his case.**

22    3. **Mr. Anastacio-Gomez's "A-File." Mr. Anastacio-Gomez requests <u>the Court enter an order</u>**

23  **giving him the opportunity for his attorney and/or a defense investigator to inspect and copy the**

24  **entire contents of his immigration "A-File" at a time mutually convenient to both parties. A proposed**

25  **order will be sent via electronic mail to Chambers as well as to the Assistant United States Attorney.**

26    4. **Brady Material**. Mr. Anastacio-Gomez requests all documents, statements, agents' reports, and

27  tangible evidence favorable to Mr. Anastacio-Gomez on the issue of guilt and/or which affects the credibility

28  of the Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as

1  exculpatory evidence falls within the definition of evidence favorable to the accused.  United States v.

2  Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976). Further, Brady requires the

3  government disclose any information that may result in a lower sentence under the sentencing guidelines,

4  notwithstanding its advisory nature, because it is exculpatory and/or mitigating evidence.

5       **5.  Mr. Anastacio-Gomez's Prior Record.**  Mr. Anastacio-Gomez requests disclosure of his prior

6  criminal record. Fed. R. Crim. P. 16(a)(1)(B).

7       **6.  Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R.

8  Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

9  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

10 general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

11 trial. Mr. Anastacio-Gomez requests the government "articulate precisely the evidential hypothesis by which

12 a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d

13 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4

14 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions). Mr. Anastacio-Gomez

15 requests **three weeks notice before trial** to give the defense time to adequately investigate and prepare for

16 trial.

17      **7.  Evidence Seized.**  Mr. Anastacio-Gomez requests production of evidence seized as a result of

18 any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(c).

19      **8.  Request for Preservation of Evidence.**  Mr. Anastacio-Gomez specifically requests the

20 preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

21 custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this

22 case.  This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Anastacio-

23 Gomez's personal effects, and any evidence seized from Mr. Anastacio-Gomez.

24      **9.  Tangible Objects.**  Mr. Anastacio-Gomez requests the opportunity to inspect, copy, and test, as

25 necessary, all other documents and tangible objects, including photographs, books, papers, documents,

26 fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

27 Government's case-in-chief, or were obtained from or belong to Mr. Anastacio-Gomez. Fed. R. Crim. P.

28 //

1  16(a)(1)(c). **Specifically, Mr. Anastacio-Gomez requests copies of the audio tapes of his alleged prior**

2  **deportations or removals.**

3      10.  **Expert Witnesses.**  Mr. Anastacio-Gomez requests the name, qualifications, and a written

4  summary of the testimony of any person that the Government intends to call as an expert witness during its

5  case in chief.  Fed. R. Crim. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided

6  a minimum of two weeks prior to trial so the defense can properly prepare to address and respond to this

7  testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

8  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any

9  expert.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and

10  must determine, reliability and relevancy of expert testimony and such determinations may require "special

11  briefing or other proceedings").

12      11.  **Scientific and Other Information.**  Mr. Anastacio-Gomez requests the results of any scientific

13  or other tests or examinations conducted by any Government agency or their subcontractors in connection

14  with this case.  See Fed. R. Crim. P. 16(a)(1)(D).

15      12.  ***Henthorn* Material.**  Mr. Anastacio-Gomez requests that the Assistant United States Attorney

16  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

17  involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419 (1995) (holding

18  that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

19  the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

20  1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

21  conduct examination of records; appropriate Government agency may review files and notify AUSA of

22  contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

23  Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

24      13.  **Evidence of Bias or Motive to Lie.**  Mr. Anastacio-Gomez requests any evidence that any

25  prospective Government witness is biased or prejudiced against Mr. Anastacio-Gomez, or has a motive to

26  falsify or distort his or her testimony.

27      14.  **Impeachment Evidence.**  Mr. Anastacio-Gomez requests any evidence that any prospective

28  Government witness has engaged in any criminal act whether or not resulting in a conviction and whether

08CR01543-H

1   any witness has made a statement favorable to Mr. Anastacio-Gomez. <u>See</u> Fed. R. Evid. 608, 609 and 613;

2   <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

3        15. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Anastacio-Gomez

4   requests any evidence that any prospective witness is under investigation by federal, state or local authorities

5   for any criminal conduct.

6        16. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**

7   Mr. Anastacio-Gomez requests any evidence, including any medical or psychiatric report or evaluation, that

8   tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is

9   impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever

10  been an alcoholic.

11       17. **Witness Addresses.** Mr. Anastacio-Gomez requests the name and last known address of each

12  prospective Government witness. Mr. Anastacio-Gomez also requests the name and last known address of

13  every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who

14  will not be called as a Government witness.

15       18. **Name of Witnesses Favorable to Mr. Anastacio-Gomez.** Mr. Anastacio-Gomez requests the

16  name of any witness who made an arguably favorable statement concerning Mr. Anastacio-Gomez or who

17  could not identify him or who was unsure of his identity, or participation in the crime charged.

18       19. **Statements Relevant to the Defense.** Mr. Anastacio-Gomez requests disclosure of any

19  statement relevant to any possible defense or contention that he might assert in his defense.

20       20. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to

21  <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Mr. Anastacio-Gomez requests all statements and/or promises,

22  express or implied, made to any witness, in exchange for their testimony in this case, and all other

23  information which could be used for impeachment. Mr. Anastacio-Gomez also requests discovery regarding

24  any other express or implicit promise, understanding, offer of immunity, of past, present, or future

25  compensation, or any other kind of agreement, promise, or understanding, including any implicit

26  understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective

27  Government witness and the Government (federal, state and/or local). This request also includes any

28  discussion with a potential witness about or advice concerning any contemplated prosecution, or any

1   possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any

2   discussion with a potential witness regarding that witness' immigration status and/or any affect that the

3   witness' statements or lack thereof might have on that status, including the granting or revoking of such

4   immigration status or any other immigration status, including but not limited to citizenship, nationality, a

5   green card, border crossing card, parole letter, or permission to remain in the United States.

6       21. **Informants and Cooperating Witnesses.**  Mr. Anastacio-Gomez requests disclosure of the

7   names and addresses of all informants or cooperating witnesses used or to be used in this case, and in

8   particular, disclosure of any informant who was a percipient witness in this case or otherwise participated

9   in the crime charged against Mr. Anastacio-Gomez.  The Government must disclose the informant's identity

10  and location, as well as the existence of any other percipient witness unknown or unknowable to the defense.

11  Roviaro v. United States, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information

12  derived from informants which exculpates or tends to exculpate Mr. Anastacio-Gomez.  Brady v. Maryland,

13  373 U.S. 83 (1963)

14      22. **Bias by Informants or Cooperating Witnesses.**  Mr. Anastacio-Gomez requests disclosure of any

15  any information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States,

16  405 U.S. 150 (1972).  Such information includes, but is not limited to, any inducements, favors, payments

17  or threats that were made to the witness in order to secure cooperation with the authorities.

18      23. **Jencks Act Material.**  Mr. Anastacio-Gomez requests production in advance of trial of all

19  material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18

20  U.S.C. § 3500.  Advance production will avoid the possibility of delay at trial to allow Mr. Anastacio-

21  Gomez to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an

22  accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under

23  § 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see United States v. Boshell, 952

24  F.2d 1101 (9th Cir. 1991) (agent's interview notes reviewed with interviewee subject to Jencks Act).

25      24. **Residual Request.**  Mr. Anastacio-Gomez intends by this discovery motion to invoke his rights

26  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

27  Constitution and laws of the United States.  Mr. Anastacio-Gomez requests that the Government provide

28  //

1    him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary

2    delay prior to cross-examination.

3    III.

4    **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
5    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
     **AFOUL OF BOTH NAVARRO-VARGAS AND WILLIAMS AND VIOLATE THE FIFTH**
6    **AMENDMENT BY DEPRIVING MR. ANASTACIO-GOMEZ OF THE TRADITIONAL**
     **FUNCTIONING OF THE GRAND JURY**

7    **A.    Introduction.**

8         The indictment in the instant case was returned by the January 2007 grand jury. See CR at 6.[1]  That

9    grand jury was instructed by Judge Burns on January 11, 2007. See Reporter's Partial Transcript of the

10   Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

11   instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit

12   cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These

13   instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors

14   during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See

15   Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit

16   B.[3]

17        **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine**
           **Whether or Not Probable Cause Exists and That They Have No Right to Decline to**
18         **Indict When the Probable Cause Standard Is Satisfied.**

19        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

20   responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from

21

22        [1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB .

23        [2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
     Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
24   States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
     F.3d 1156 (9th Cir. 2002) (per curiam).

25

26        [3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the
     role of the grand jury.  Mr. Anastacio-Gomez requests that the video presentation be produced.  See United
27   States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret,
     but the ground rules by which the grand jury conducts those proceedings are not.").

28        [4] See also id. at 20 ("You're all about probable cause.").

7                                                        08CR01543-H

1  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

2  federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See

3  id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

4  that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

5  even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

6  may be insufficient.'" See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

7  because the grand jurors disagree with a proposed prosecution.

8      Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

9  to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

10      I've gone over this with a couple of people.  You understood from the questions and answers
         that a couple of people were excused, I think three in this case, because they could not adhere

11      to the principle that I'm about to tell you.

12  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

13  disagreement with Congress.  See id. at 8-9.  Thus, the Court not only instructed the grand jurors on its view

14  of their discretion; it enforced that view on pain of being excused from service as a grand juror.

15      Examination of the recently disclosed voir dire transcript, which contains additional instructions and

16  commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

17  reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause

18  exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by

19  Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In

20  one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is

21  probable cause determination.

22      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
         crime was committed?  And second, do we have a reasonable belief that the person that they

23      propose that we indict committed the crime?"

24      If the answer is "yes" to both of those, then the case should move forward.  If the answer to
         either of the questions is "no," then the grand jury should not hesitate and not indict.

25

26  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

27  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

28  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

1  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

2  crime."

3    Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that,

4  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

5  Because of the redactions of the grand jurors' names, Mr. Anastacio-Gomez will refer to them by

6  occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent

7  (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug

8  prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain

9  unspecified immigration cases. See id.

10    Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

11  CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in

12  this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

13  Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have

14  possessed were simply not capable of expression in the context of grand jury service.

15      Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the
        defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair

16      appraisal of the evidence of the case that's in front of you, so, too, is the United States
        entitled to a fair judgment. If there's probable cause, then the case should go forward. *I*

17      *wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our
        government is doing. I disagree with these laws, so I'm not going to vote for it to go

18      forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell
        me that.

19

20  See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand

21  juror know that it would not want him or her to decline to indict in an individual case where the grand juror

22  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id.

23  Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

24  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

25  a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question

26  provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of

27  a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any

28  //

1  grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

2  would permit them to vote "no bill" in the face of a showing probable cause.

3         Just in case there may have been a grand juror that did not understand his or her inability to exercise

4  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

5  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

6  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

7  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

8  considerations into account.

9         Well, those things -- the consequences of your determination shouldn't concern you in the
       sense that penalties or punishment, things like that -- we tell trial jurors, of course, that

10       they cannot consider the punishment or the consequence that Congress has set for these
       things.  We'd ask you to also abide by that.  We want you to make a business-like

11       decision of whether there was a probable cause. . . .

12  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

13  went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

14         In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

15  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

16  juror is obligated to vote to indict if there is probable cause.

17       I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
       I have to make.  But my alternative is to vote for someone different, vote for someone that

18       supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
       like it.  So I'm not going to follow it here."

19
       You'd have a similar obligation as a grand juror even though you might have to grit your

20       teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against,
       for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against

21       criminalizing some drugs.

22       That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
       say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a crime

23       was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then
       your obligation, if you find those to be true, would be to vote in favor of the case going*

24       *forward.*

25  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

26  both questions are answered in the affirmative, lead to an "obligation" to indict.

27  //

28  //

1    Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

2    paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

3    to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you
> were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

8    Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

9    political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

10   should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

11   indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge

12   Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA

13   to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to

14   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

15   forward."[5] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict

16   was too great a risk to run.

## 2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

19   In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

20   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See

21   Ex. A at 20.[6]

---

[5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act

1   Now, again, this emphasizes the difference between the function of the grand jury and the
2   trial jury. You're all about probable cause. If you think that there's evidence out there that
    might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
    you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3   *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
    *aware of that evidence.*
4

5   Id. (emphasis added).

6        The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9   adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

11  that was "adverse" or "that cuts against the charge." See id.

12  //

13  //

14  //

15

16  _____

17  in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire
    go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
18  whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective
    juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the
19  things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you
    give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the
20  business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't
    substantiate the charges against.").
21        Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded
    the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions
22  implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow
    the government attorneys to act inappropriately or to present cases for indictment where no probable cause
23  existed.
24        In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses,
    Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there
25  is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the
    dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction,
26  which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition
    that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume
27  grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume
    that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify
28  whether they understood the instruction as given and then followed it.").

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

---

[7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

2  Procedure § 15.2(g) (2d ed. 1999)).

3      Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

4  in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

5      The grand jury thus determines not only whether probable cause exists, but also whether to
       "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
6      most significant of all, a capital offense or a non-capital offense -- all on the basis of the
       same facts. And, significantly, the grand jury may refuse to return an indictment even
7      "'where a conviction can be obtained.'"

8  Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

9  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

10  "controls not only the initial decision to indict, but also significant questions such as how many counts to

11  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

12  a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas

13  II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

14  refuse to indict someone even when the prosecutor has established probable cause that this individual has

15  committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899

16  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

17  (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the

18  Ninth Circuit. But not in Judge Burns's instructions.

19  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both
        Vasquez and Navarro-Vargas II.**

20

21      The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

22  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

23  decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

24  every finding of probable cause because the term "should" may mean "what is probable or expected." 299

25  F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge

26  Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

27  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

28  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See

                                    14                        08CR01543-H

1   also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

2   Diction and Language Guide 1579 (1999) (brackets in original)).

3          The debate about what the word "should" means is irrelevant here; the instructions here make no

4   such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

5   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

6   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

7   indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction

8   flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No

9   grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

10  indict."  Vasquez, 474 U.S. at 264.

11         While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

12  an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that Judge Burns

13  could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge

14  Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there

15  is not probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context,

16  it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room

17  for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.

18  Clearly Judge Burns was not.

19         The full passage cited above effectively eliminates any possibility that Judge Burns intended the

20  Navarro-Vargas spin on the word "should."

21         [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
           crime was committed?  And second, do we have a reasonable belief that the person that they
22         propose that we indict committed the crime?"

23         If the answer is "yes" to both of those, then the case should move forward.  If the answer to
           either of the questions is "no," then the grand jury should not hesitate and not indict.
24

25  See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

26  that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to

27  "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

28  F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

1  protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

2  "responsibilities continue to include both the determination whether there is probable cause and the

3  protection of citizens against unfounded criminal prosecutions.") (citation omitted).

4        By the same token, if Judge Burns said that "the case should move forward" if there is probable

5  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

6  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have

7  intended two different meanings of the word "should" in the space of two consecutive sentences.  That could

8  not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors

9  are not presumed to be capable of sorting through internally contradictory instructions.  See generally United

10  States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

11  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

12        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

13  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

14        **(1)**      The first occasion occurred in the following exchange when Judge Burns conducted voir dire

15  and excused a potential juror (CSW):

16        The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
          you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
17        is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
          your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
18        Prospective Juror: Well, I think I may fall in that category.
          The Court: In the latter category?
19        Prospective Juror: Yes.
          The Court: Where it would be difficult for you to support a charge even if  you thought the
20        evidence warranted it?
          Prospective Juror: Yes.
21        The Court: I'm going to excuse you then

22  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

23  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

24  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

25

26

27        [8] This argument does not turn on Mr. Anastacio-Gomez' view that the Navarro-Vargas/Marcucci
    reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context
28  in which the word is employed by Judge Burns in his unique instructions, context which eliminates the
    Navarro-Vargas/Marcucci reading as a possibility.

1 wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

2 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as

3 to the exercise of discretion by any other prospective grand juror.

4         **(2)**      In an even more explicit example of what "should" meant, Judge Burns makes clear that it

5 there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

6 Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

7         You'd have a similar *obligation* as a grand juror even though you might have to grit your
        teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against,

8         for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
        criminalizing some drugs.

9

10         That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to
        say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a

11         crime was committed? Yes.  Does it seem to me that this person's involved? It does."  *And
        then your obligation, if you find those things to be true, would be to vote in favor of the case

12         going forward*.

13 Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

14 were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

15 were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror

16 responded: "It would depend on the case." Id.  Nevertheless, that juror was excused. Id. at 28.  Again, in

17 this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and

18 the juror has no prerogative to do anything other than indict if there is probable cause.

19         Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

20 a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

21 rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

22 indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

23 prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

24 scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled

25 the prospective jurors, because his message is that there is no discretion not to indict.

26         **(3)**      As if the preceding examples were not enough, Judge Burns continued to pound the point

27 home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

28 //

1    on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

2    here."  See id. at 61.

3        **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

4    every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it

5    reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

6    that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of

7    what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

8        Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

9    penalties to which indicted persons may be subject.

10       Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
         about because there is a disparity between state and federal law.

11       The Court:  In what regard?
         Prospective Juror: Specifically, medical marijuana.

12       The Court:  Well, those things -- the consequences of your determination shouldn't concern
         you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*

13       *that they cannot consider the punishment or the consequence that Congress has set for these*
         *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision

14       of whether there was a probable cause. ...

15   See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

16   would obviously leave no role for the consideration of penalty information.

17       The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

18   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

19   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

20   reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

21   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

22   ever was any) relied upon by Cortez-Rivera.   The instructions again violate Vasquez, which plainly

23   authorized consideration of penalty information.  See 474 U.S. at 263.

24       Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

25   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

26   was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

27   contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

28   //

1  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

2  Vasquez:

> 3  The grand jury does not determine only that probable cause exists to believe that a defendant
> committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge
> 4  a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
> significant of all, a capital offense or a non-capital offense – all on the basis of the same
> 5  facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction
> can be obtained."

6

7  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

8  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

9  the initial decision to indict, but also significant decisions such as how many counts to charge and whether

10  to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

11  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

12  See id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

13  structural constitutional error "that interferes with the grand jury's independence and the integrity of the

14  grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment

15  must therefore be dismissed.  Id.

16      The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

17  instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

18  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

19  decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

20  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

21  independent."  Id. at 1202 (emphases in the original).

22      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

23  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

24  of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

25  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

26  making a probable cause determination ... unconstitutionally undermines the very structural protections that

27  the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

28  that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

1  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

2  in <u>Vasquez</u>.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

3  erroneous instructions because nothing will happen if they disobey them."  <u>Id.</u>

4       In setting forth Judge Hawkins' views, Mr. Anastacio-Gomez understands that Judge Burns may not

5  adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

6  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

7       Here, again, the question is not an obscure interpretation of the word "should", especially in light

8  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

9  the Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the defense, but an absolute ban

10  on the right to refuse to indict that directly conflicts with the recognition of that right in <u>Vasquez</u>, <u>Campbell</u>,

11  and both <u>Navarro-Vargas II</u> opinions.  <u>Navarro-Vargas II</u> is distinguishable on that basis, but not only that.

12       Judge Burns did not limit itself to denying the grand jurors the power that <u>Vasquez</u> plainly states they

13  enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

14  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  <u>See</u>

15  Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

16  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

17  conscience of the community.  <u>See Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

18  grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

19  of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

20  1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

21  their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

22  here, Judge Burns has both fashioned his own rules and enforced them.

23  **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
       **Exculpatory Evidence to the Grand Jury.**
24

25       In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

26  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

27  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

28  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

1    judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority

2    "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

3    amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge

4    Burns and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted),

5    it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

6    Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

7    initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's

8    claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

9        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

10    present to them evidence that tended to undercut probable cause. See Ex. A at 20.

11        Now, again, this emphasizes the difference between the function of the grand jury and the
      trial jury. You're all about probable cause. If you think that there's evidence out there that
12    might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
      to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-*
13    *bound to present evidence that cuts against what they may be asking you to do if they're*
      *aware of that evidence.*
14

15    Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their

16    duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

17    [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

18    id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

19    Navarro-Vargas, 408 F.3d at 1207.

20        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

21    if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

22    conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again,

23    the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

24    probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

25    would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

26    should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

27    will present it. The end result, then, is that grand jurors should consider evidence that goes against probable

28    cause, but, if none is presented by the government, they can presume that there is none. After all, "in most

1  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

2  you to do if they're aware of that evidence." <u>See</u> <u>id.</u>  Moreover, during voir dire, Judge Burns informed the

3  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

4  that cuts against the charge, you'll be informed of that.  *They have a duty to do that.*"  <u>See</u> Ex. B at 14-15

5  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

6  the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

7  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

8  to you." <u>See</u> Ex. A at 27.

9  These instructions create a presumption that, in cases where the prosecutor does not present

10  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

11  exculpatory evidence was presented, would proceed along these lines:

12      (1)    I have to consider evidence that undercuts probable cause.
    (2)The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
13      evidence to me, if it existed.
    (3)    Because no such evidence was presented to me, I may conclude that there is none.
14

15  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

16  evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

17  bound prosecutor would have presented it.

18  The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

19  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

20  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

21  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

22  the Fifth Amendment.

23  **IV.**

24  **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

25  ***Defense counsel has received 25 pages of discovery in this case.***  As more information comes to

26  light, due to the Government providing additional discovery in response to these motions or an order of this

27  Court, the defense may find it necessary to file further motions.  It is, therefore, requested that defense

28  counsel be allowed the opportunity to file further motions based upon information gained through the

discovery process. **Specifically, defense counsel has not yet had an opportunity to examine Mr. Anastacio-Gomez's immigration A-file yet. After examining his A-file, Mr. Anastacio-Gomez anticipates he may file a motion to attack any alleged deportations. Mr. Anastacio-Gomez thus requests an opportunity to file further motions upon review of his A-file.**

V.

**<u>CONCLUSION</u>**

For the foregoing reasons, Mr. Anastacio-Gomez respectfully requests that the Court grant the above motions.

Respectfully submitted,


Dated: May 23, 2008                     */s/ Hanni M. Fakhoury*
                                        **HANNI M. FAKHOURY**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Anastacio-Gomez